**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| QPRO INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-09-3904 |
| | § | |
| RTD QUALITY SERVICES USA, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

QPro Inc. sued RTD Quality Services USA, Inc. in Texas state court, alleging tortious interference in a contract between QPro and Dow Chemical Company. RTD (USA) removed under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–08, based on an arbitration agreement between QPro and Applus RTD, the foreign parent of RTD (USA). (Docket Entry No. 1). This court denied QPro's motion to remand because under 9 U.S.C. § 203, a defendant has the right to remove an action or proceeding that "*relates to an arbitration agreement* or award *falling under the Convention* . . . any time before the trial thereof . . . to the district court of the United States for the district and division embracing the place where the action or proceeding is pending." 9 U.S.C. § 205 (emphasis added).[1] To remove a case under

---

[1] Section 205 states:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this

§ 205, a defendant must show that (1) an arbitration agreement exists that "falls under" the Convention, and (2) the dispute "relates to" the arbitration agreement. *Ling v. Deutsche Bank AG*, No. 4:05CV345, 2005 WL 3158040, at *5 (E.D. Tex. Nov. 28, 2005). This court denied remand because the case law sets a very low standard for making this showing. *See Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002). Under *Beiser,* so long as there is "*an arbitration agreement* falling under the Convention [that] *could conceivably affect* the outcome of the plaintiff's case," the "relates to" test is satisfied. 284 F.3d at 669 (emphasis added). The defendant need not show that it has the right to enforce the arbitration agreement. *Beiser* recognizes that "even if [the plaintiff] is right on the merits that he cannot ultimately be forced into arbitration, his suit at least has a 'connection with' the contracts governing the transaction out of which his claims arise." *Id.* at 670.

After this court denied the motion to remand, RTD complied with the scheduling order for filing a motion to compel arbitration, (Docket Entry No. 12). Q Pro responded, (Docket Entry No. 13); RTD replied, (Docket Entry No. 14); and QPro surreplied, asking this court to remand, (Docket Entry No. 15).

Based on the motion and responses, the record, and the applicable law, this court denies the motion to compel, finding that the requirements for allowing a nonsignatory to compel arbitration with a signatory are not satisfied, and grants QPro's motion to remand. The reasons are explained below.

**I.    Background**

In its state-court petition, QPro, a Texas company, asserted that it is in the business of

---

title any action or proceeding removed under this section shall be deemed
to have been brought in the district court to which it is removed.
9 U.S.C. § 205.

providing nondestructive testing and inspection services for insulated and coated piping and related equipment in plant facilities and pipelines, primarily to detect corrosion. (Docket Entry No. 1, Ex. B, Original State Court Petition, ¶ 5). QPro leased a technology called INCOTEST to perform its work. This technology allows the inspection of insulated piping without removing the insulation and coatings. QPro leased this technology from Applus RTD, the parent company of RTD (USA). (*Id.*, ¶¶ 6–8). Applus is a Dutch company located in The Netherlands. QPro has a five-year nonexclusive lease agreement with Applus to use the INCOTEST technology. The lease expiration date is in 2011. (*Id.*, ¶ 6).

In 2006, QPro began a three-year service agreement with Dow Chemical to inspect and test its piping systems for corrosion under insulation. QPro alleged in the state-court petition that it used the INCOTEST system as one of its primary inspection technologies in performing the Dow Chemical agreement. QPro alleged that it intended to lease a second INCOTEST system from Applus as the work from Dow Chemical increased. QPro alleged that it had an understanding with Applus that as QPro's work under the Dow agreement increased, QPro would provide additional INCOTEST systems leased from Applus. (*Id.*, ¶¶ 7–8). For a period, Applus "consistently assured" QPro that such a lease would be available. (*Id.*, ¶ 8). QPro alleged that when it was ready to enter into a lease for a second INCOTEST system, Applus failed to provide it. (*Id.*).

QPro alleged an explanation for Applus's failure to lease a second system. QPro had refused Applus's effort to acquire QPro in February 2007. Instead, QPro sold part of its shares to another investor. Since then, according to QPro, because "Applus could not acquire QPro, it purposed to put QPro out of business by any means and its subsidiary, RTD (USA), has been pursuing exactly that." (*Id.*, ¶ 9).

According to QPro, RTD (USA) "colluded" with another company, Team Industrial Services, Inc., to induce Dow Chemical to eliminate or reduce the services QPro provided under its contract. Because Team Industrial did not have the INCOTEST technology that the Dow inspection contract required, RTD offered to subcontract INCOTEST services to Team Industrial. Team Industrial and RTD (USA) went to Dow Chemical and allegedly "misrepresented that QPro would soon be unable to service its agreement with Dow because it would no longer have the INCOTEST technology." (*Id.*, ¶ 10). As a result, Dow called for an early rebid of the inspection contract it had with QPro. Team Industrial was one of the specified bidders on that contract, along with QPro. According to QPro, this was inconsistent with its belief that it would continue to be the only provider of CUI inspection services to Dow through the end of its contract with Dow. (*Id.*).

RTD (USA) also allegedly induced QPro's senior INCOTEST technician to go to work for RTD (USA), on the misrepresentation that QPro was in danger of losing its INCOTEST license and equipment. According to QPro, as a result of the misrepresentation by RTD to QPro's employees and QPro's clients — such as Dow — that QPro would lose its INCOTEST lease, Dow rebid the contract, awarded the majority of the work to Team Industrial, and reduced the services obtained through QPro. QPro alleges that this was a misrepresentation because Applus, the lessor, had not notified QPro that it intended to withhold the technology in the future or to deny a renewal of the existing equipment lease beyond the 20011 expiration. (*Id.*, ¶ 11). QPro alleged that RTD tortiously interfered in QPro's contract with Dow and seeks the revenues lost through Dow's reducing the services it requires from QPro under its inspection contract, including actual, consequential, and exemplary damages. (*Id.*, ¶¶ 13–15).

The INCOTEST lease agreement between QPro and Applus contains the following

4

arbitration clause:

> Each party undertakes to make its best effort to settle amicably any dispute with the other party arising out of or relating to this agreement. If such settlement efforts fail, disputes arising in connection with the present agreement shall be finally settled under the then current Rules of Conciliation and Arbitration of the International Chamber of Commerce in The Hague, The Netherlands. The arbitration proceedings shall be held in The Netherlands. The language of the arbitration shall be in English.

(Docket Entry No. 1, Ex. 1, ¶ 16.02). The lease also provides that "[t]he validity and interpretation of this agreement and the legal relations of the parties to it shall be governed by the laws of The Netherlands." (*Id.*, ¶ 16.01). The lease also includes a bar against special, indirect, or consequential damages. (*Id.*, ¶ 17.02).

On October 5, 2009, QPro filed its state-court suit against RTD (USA). (Docket Entry No. 1, Ex. B). On December 4, 2009, RTD (USA) timely removed. (Docket Entry No. 1). In the Notice of Removal, RTD (USA) asserted that removal was proper under 9 U.S.C. § 205 because the state-court action "relates to an arbitration agreement governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards Act." (*Id.* at 1 (citing 9 U.S.C. §§ 201–08)). RTD (USA) asserts that there is original jurisdiction under 9 U.S.C. § 203 and that removal is proper under 9 U.S.C. § 205. (*Id.*). RTD (USA)'s Notice of Removal stated that the legal relationship between QPro and Applus is subject to international arbitration under the lease, which falls under the Convention Act. The Notice laid out the following arguments for removing under § 205 on the basis that the state-court claims and defenses "relate to" the lease:

- QPro's factual allegations focus on Applus's actions regarding the lease and its use of RTD (USA) to put QPro out of business;

- the alleged misrepresentations by RTD (USA) were that Applus was going to cancel

5

> the INCOTEST lease; and
>
> •   the lease terms — including the arbitration clause, the choice-of-law provision, the provision limiting damages, and the provisions allowing RTD (USA) to use the INCOTEST technology without accounting to QPro or others — provide RTD (USA) with defenses to the tortious interference claims, including the defense that the statements RTD (USA) made about the lease were true.

(Docket Entry No. 1, Notice of Removal, at 2–3).

In its motion to compel arbitration, RTD relies on these same points. Three issues, and a threshold question, must be addressed. The first is whether RTD can enforce the arbitration clause in the lease between QPro and Applus under equitable estoppel. RTD argues that as a nonsignatory, it can enforce the arbitration clause against QPro, a signatory, because QPro's tortious interference claim against RTD "relies on" that lease. QPro responds that its claim is not dependent on the lease terms. The second is whether QPro's suit alleges such intertwined misconduct between the signatory (Applus) and the nonsignatory (RTD) as to make it equitable to compel QPro to arbitrate the claims. QPro responds that there are no allegations of such intertwined conduct by a signatory and nonsignatory to allow the nonsignatory to compel arbitration. A third issue is whether, assuming the requirements of equitable estoppel are met, the claims in QPro's suit arise out of the lease containing the arbitration clause. The threshold issue is whether this court or an arbitrator decides arbitrability. These issues are analyzed below.[2]

---

[2] RTD cites both federal and Texas law. The Supreme Court has held that state contract law governs the ability of nonsignatories to enforce arbitration provisions." *Arthur Andersen LLP v. Carlisle*, --- U.S. ----, 129 S. Ct. 1896, 1902 (2009) ("'State law,' therefore, is applicable to determine which contracts are binding under § 2 [of the Federal Arbitration Act] and enforceable under § 3 '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'" (*quoting Perry v. Thomas,* 482 U.S. 483, 493 n.9, 107 S. Ct. 2520 (1987))).

**I.      Who Decides Whether RTD Can Compel QPro to Arbitrate?**

The Supreme Court has held that if the parties agreed to submit the arbitrability decision to an arbitration panel, then the court must defer to the arbitrator's decision on arbitrability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1924 (1995). If, however, there was no agreement on who would decide if a dispute was arbitrable, the decision should be with the court. *Id.* at 943, 115 S. Ct. at 1923–24. Courts apply a presumption in favor of arbitration of a dispute if the arbitration agreement is ambiguous, but the presumption is reversed for ambiguities over whether there is an agreement to submit arbitrability to the arbitrator. *Id.* at 944, 115 S. Ct. at 1924. A court "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944, 115 S. Ct. at 1924 (alterations in original).

When, as here, the issue is whether a nonsignatory to an arbitration clause may enforce it against a signatory, the courts have viewed that as a matter for the court to decide. *See, e.g.*, *Arthur Andersen LLP v. Carlisle*, --- U.S. ----, 129 S. Ct. 1896, 1902 (2009). RTD cites *Qualcomm, Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006), to argue that because the lease agreement between QPro and Applus called for arbitration in accordance with the ICC Rules, the parties evidenced a clear intent to arbitrate the issue of arbitrability and, consequently, the arbitrator must resolve whether the claims in the instant action are arbitrable. *Qualcomm* involved a contract in which the parties agreed that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement, or the breach or validity hereof, shall be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association ('AAA Rules')." *Id.* at 1372–73. The AAA Rules state that the arbitration tribunal "shall have the power to rule on its own jurisdiction, including any

7

objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 1373 (internal citation omitted). The court in *Qualcomm* adopted the reasoning of the First and Second Circuits and found this language indicated a "clear and unmistakable" intent by the parties to delegate the power to decide arbitrability to the arbitrator. *Id.*; *see also Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 211 (2d Cir. 2005) (holding that a party who agreed to arbitration under the AAA Rules cannot avoid arbitrating arbitrability); *Apollo Computer, Inc. v. Helge Berg*, 886 F.2d 469, 473 (1st Cir. 1989) (holding that by contracting to have all disputes resolved according to the ICC Rules, the signatories to the agreement were bound by the ICC "provisions clearly and unmistakably allow[ing] the arbitrator to determine her own jurisdiction when . . . there exists a *prima facie* agreement to arbitrate").

Following the reasoning of the First, Second, and Federal Circuits, an arbitrator in an ICC arbitration would have jurisdiction to decide issues of arbitrability, but only between the parties to the arbitration agreement, here, QPro and Applus. The cases extending this reasoning and allowing a nonsignatory to compel a signatory to arbitrate issues of arbitrability involve a nonsignatory defendant that essentially stood in the shoes of a signatory to the arbitration agreement when defending the suit. *Apollo* involved an arbitration agreement between two companies, one of which filed for bankruptcy; the bankruptcy trustee assigned that company's right to bring suit to the nonsignatory defendants, which the court allowed to compel the plaintiff signatory company to arbitrate issues of arbitrability. 886 F.2d at 470–74. In *Contec,* the nonsignatory defendant was a later corporate form of the original signatory to the arbitration agreement, and the mergers and changes in corporate form had not affected the business relationship between the two companies. 398 F.205 at 207. The court allowed the nonsignatory defendant to compel the signatory to arbitrate

8

issues of arbitrability because the defendant was essentially equivalent to the original signatory to the arbitration agreement. *Id.* In this case, by contrast, the theories advanced by RTD to compel QPro to arbitrate the dispute do not rest on such a relationship between the signatory parent, Applus, and the nonsignatory subsidiary, RTD. The equitable considerations that led the courts in *Apollo* and *Contec* to compel the parties to arbitrate issues of arbitrability are not present in this case. *See, e.g.*, *Koman v. Weingarten/Investments, Inc.*, Civ. A. No. H-10-1836, 2010 WL 3717312, at *3–4 (S.D. Tex. Sept. 17, 2010) (refusing to find that a nonsignatory had agreed to allow the arbitrator to decide arbitrability).[3] This court must decide arbitrability.

## II.     Does Equitable Estoppel Allow RTD to Compel QPro to Arbitrate its Claim?

The parties agree that the governing case is *Grigson v. Creative Artists Agency, LLC*, in which the Fifth Circuit adopted equitable estoppel as a basis for a nonsignatory to compel a signatory to arbitrate a claim, and its progeny. 210 F.3d 524 (5th Cir. 2000). In *Grigson,* the court affirmed an order compelling producers of a movie and a trustee for the owner of the movie to arbitrate their claims alleging tortious interference with a distribution agreement by an actor and his agent, who had not signed the agreement. *Id.* at 530. The movie's distribution was first delayed to capitalize on a pending success of one of the actors, and then limited. Initially, the trustee for the owners of the movie had sued the distributor for violation of the agreement, but the trustee had that

---

[3] To the extent that state contract law applies to determine the question, Texas law would not find that the arbitration clause was sufficient to allow the arbitrator to decide arbitrability. *See, e.g.*, *Haddock v. Quinn*, 287 S.W.3d 158, 175 (Tex. App.—Ft. Worth 2009, pet. denied) (holding that "a general reference in the arbitration agreement to the AAA rules, without more, does not clearly and unmistakably manifest [the] parties' intent to refer the issue of waiver by litigation conduct to the arbitrator"); *Burlington Res. Oil & Gas Co. v. San Juan Basin Royalty Tr.*, 249 S.W.3d 34, 40 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (reasoning that even "if we were to conclude . . . that some ambiguity was created by the parties' reference to the AAA rules, the parties simply did not clearly and unmistakably submit the issue of arbitrability to arbitration").

action dismissed when the distributor sought to enforce the distribution agreement's arbitration clause. A few months later, the trustee, now joined by the producers, sued the actor and his agency for tortious interference with the distribution agreement, claiming that they pressured the distributor to limit the release because they viewed it as an improper exploitation of the actor's success after acting in the movie. Those defendants, although nonsignatories to the distribution agreement, moved to compel arbitration under the agreement, and the district court granted the motion. *Id.* at 526. The appellate court affirmed, holding that the district court did not abuse its discretion by concluding that the plaintiffs' claims were so intertwined with and dependent on the distribution agreement that the arbitration agreement within the distribution agreement should be given effect. *Id.* at 529–30. The court explained that this conclusion was compelled by comparing the complaint with the distribution agreement. In addition to the plaintiffs relying on the terms of the agreement in asserting their claims, the distributor and the defendants were charged with interdependent and concerted misconduct. *Id.* at 530. In the distribution agreement, all rights to the movie were given to the distributor; and, subject to it making a required minimum expenditure in connection with the theatrical release, the distributor had absolute discretion to be exercised in good faith concerning the exploitation of the movie in any and all media. The scope of the distribution, the discretion vested in the distributor, and its good-faith judgment were at the center of the dispute. *Id.* at 529–30. Among other things, the distributor allegedly failed to use its good faith as a result of the claimed interference. Noting what it called an obvious attempt to make an end-run around the arbitration clause, the court pointed out that the distributor, even though it was not sued, would be extensively involved in the dispute. *Id.* at 528–29. How possible damages might be computed, in the light of the detailed accounting provisions of the agreement, was another example of the action's

relationship to the underlying distribution agreement. In essence, the court said, the distributor was a defendant, stating that the present action was the quintessential situation in which the doctrine of estoppel should be applied. *Id.* at 530.

Equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against a nonsignatory. As noted in *Grigson*,

> When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*Id.* at 527 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)); *see also Hill v. GE Power Sys.*, 282 F.3d 343, 348 (5th Cir. 2002). "[W]hether to utilize equitable estoppel in this fashion is within the district court's discretion." *Grigson*, 210 F.3d at 528. This doctrine recognizes that it would be unfair to allow a plaintiff to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage.

### A. Does QPro's Tortious Interference Claim Rely on Its Lease With Applus?

Since *Grigson*, the Fifth Circuit and district courts within the Fifth Circuit have clarified that the fact that a cause of action presumes the existence of a written agreement containing an arbitration clause is not enough to entitle the nonsignatory to enforce the clause. *See Hill*, 282 F.3d at 348. Instead, as stated in *Grigson,* the signatory's claim "must rely on the *terms* of the written

11

agreement" before the nonsignatory may enforce an arbitration clause. *Id.* (emphasis added); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 540 (N.D. Tex. 2003) (concluding that a nonsignatory could not invoke arbitration clause where the plaintiff's claims "[presumed]" the existence of the agreement but did not rely upon its terms); *Vinewood Capital, LLC v. Dar al-Maal al-Islami Trust*, No. 4:06-CV-361-Y, 2007 WL 2791876, at *6 (N.D. Tex. Sept. 26, 2007), *aff'd by* 295 F. App'x 726 (5th Cir. Oct. 10, 2008) ("The first basis requires a signatory's claim to *completely* rely on the terms of an agreement that contains an arbitration clause.") (emphasis added); *Vinewood Capital, LLC v. Sheppard Mullin Richter & Hampton, LLP*, Civ. A. No. 4:10-CV-220, 2010 WL 3283043, at *6–7 (N.D. Tex. Aug. 19, 2010) (concluding that nonsignatory could not invoke an arbitration clause to arbitrate a fraud claim because "[a] fraud claim, by its nature, does not depend on the terms of the contract"). *Compare Jureczki v. Bank One Tex., N.A.*, 252 F. Supp. 2d 368, 375 (S.D. Tex. 2003) (concluding that because claims were "necessarily governed by plaintiff's contract" which contained an arbitration clause, nonsignatory defendants could invoke such clause).

Under governing law, the claim raised in the litigation must rely on the language of the agreement containing the arbitration clause, rather than just presume its existence, for this basis of equitable estoppel to apply. *Grigson*, 210 F.3d at 527; *Positive Software*, 259 F. Supp. 2d at 540; *Dar al-Maal al-Islami*, 2007 WL 2791876, at *6; *Sheppard Mullin*, 2010 WL 3283043, at *6–7; *see also Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002) (stating that equitable estoppel is appropriate "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non-signatory."). In this case, the tortious interference claim against RTD presumes the existence of the lease agreement

between QPro and Applus. But the claim does not depend on the terms of that agreement, such that QPro is simultaneously invoking the lease yet refusing to comply with the arbitration clause it contains. QPro alleges that Applus refused to enter into a second, *separate* lease, independent of the lease agreement at issue. QPro alleges that RTD made misrepresentations about whether QPro would continue to have the INCOTEST license, which QPro asserts was false. This claim presumes the existence of QPro's present lease agreement with Applus but does not rely on the terms of that agreement. Instead, it alleges conduct separate from the specific rights and obligations under the agreement.

RTD asserts that certain of the lease terms might provide a defense to QPro's suit, specifically the nonexclusivity of the lease and its limit on consequential damages. But QPro has not alleged that it had an exclusive right to use the INCOTEST technology under the lease with Applus. Nor has QPro alleged that Applus failed to comply with any terms of the lease agreement. The only allegations about Applus's conduct are not about the specific terms of the existing lease. QPro alleges that Applus has not indicated any intent to withhold the INCOTEST technology in the future or that it will deny a renewal of the existing lease beyond its expiration. RTD's alleged conduct is separate from Applus's or QPro's rights or obligations under the existing lease agreement.

The tortious interference claim by QPro against RTD does not rely on the terms of the lease agreement between RTD and Applus. The close relationship between the alleged tortious interference and the underlying contractual obligations necessary to allow the nonsignatory to the contract to enforce the arbitration clause is not present. *See Hill*, 282 F.3d at 349 (stating that *Grigson* holds that "equitable estoppel applies when the signatory to a written agreement containing an arbitration clause *must rely on the terms of the written agreement in asserting its claims against*

13

*the nonsignatory*") (emphasis in original). The first basis for equitable estoppel has not been met.

### B.  Did QPro Allege "Substantially Interdependent and Concerted Misconduct" by RTD and Applus?

The second basis for compelling arbitration discussed in *Grigson* is only met if a signatory to the arbitration clause alleges interdependent conduct by both a signatory and a nonsignatory to the arbitration agreement and the nonsignatory defendant seeks to compel the signatory plaintiff to arbitrate all claims. *See, e.g.*, *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398–99 (5th Cir. 2006) (compelling a plaintiff to arbitrate claims against a parent company who was not a party to the arbitration agreement because the claims were factually tied to claims alleged against subsidiaries who were parties to the arbitration agreement). RTD bases its argument on paragraph 9 of the state-court petition. QPro alleged that Applus "purposed to put QPro out of business by any means and its subsidiary, RTD (USA) has been pursuing exactly that." (Docket Entry No. 1, Ex. B, Original State Court Petition, ¶ 9). QPro then alleged that RTD colluded with a company called Team Industrial to make misrepresentations about QPro's ability to use the INCOTEST technology in the future to induce Dow to reduce or eliminate the services it would receive from QPro under the Dow contract. (*Id.*, ¶ 10).

The case law on when a signatory's allegations of misconduct involving both a parent and subsidiary are so intertwined as to provide a basis for the nonsignatory to compel arbitration of those allegations rests on the premise that if the arbitration is not required, the arbitration clause between the two signatories would be rendered meaningless and the policy favoring arbitration frustrated. *Brantley v. Republic Mortgage Ins. Co.,* 424 F.3d 392, 395–96 (4th Cir. 2005) (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). In *Hill v. G E Power Systems, Inc.*, 282 F.3d 343 (5th Cir. 2002), a case involving a failed project to construct power plants and gas

storage facilities, the court held that a prospective lender, which had not signed an arbitration agreement, was entitled to compel an energy company to arbitrate claims that included allegations of interdependent and concerted conduct by the lender and its affiliate, which had signed the agreement. In that case, the appellate court upheld the lower court's refusal to apply equitable estoppel to allow the lender to compel arbitration of a claim asserted against it by an energy company because those claims did not rely on the express terms of the agreement containing the arbitration clause. *Id.* at 349. The dispute arose out of an agreement between an energy company, which was to develop a power plant, and a financial company, which was to secure financing, to build two power plants and a gas storage facility. These two parties entered into a memorandum of understanding that included a confidentiality agreement and named another company — an affiliate of the nonsignatory seeking relief — as the financial advisor to the project. The financial advisor also entered into an agreement with the developer. None of these agreements included an arbitration clause. *Id.* at 345–46. Subsequently, the developer and the financial company entered into a termination agreement containing an arbitration clause that ended the memorandum of understanding; the lender was not a party to the termination agreement. The termination agreement specified that it superseded all prior agreements, discussions, and understandings and disallowed any rights that might accrue to any third-party beneficiary. The energy company alleged that it entered into the termination agreement because the financial company and its affiliate, the prospective lender, conspired to force the energy company to use an experimental turbine at one of its project sites, requiring the energy company to cover the nonfinanced part of the turbine. The energy company also alleged that the lender instructed its affiliate to withhold payments to the energy company for development costs and instructed the affiliated financial advisor to withhold

15

information from the energy company and to stall financing of the project. *Id.* at 346. The energy company filed suit against the company with which it had signed the termination agreement. Facing a demand for arbitration, the energy company added the lender as a defendant, with which it had no arbitration agreement. The lender appealed the refusal both to stay the suit against it pending the energy company's arbitration with the financial company and to order the energy company's suit against it to arbitration. *Id.* The court reversed the district court's refusal to stay the suit against the lender pending the energy company's arbitration with the financial company, but affirmed its refusal to compel the energy company to arbitrate its claims against the lender. The court acknowledged that equitable estoppel applies where the signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. The complaint alleged that the financial company and lender worked in tandem to misappropriate the energy company's trade secrets and to fraudulently induce it to contract with them. *Id.* at 347–48. Noting that the linchpin for equitable estoppel is equity, the court concluded that the district court did not abuse its discretion. *Id.* at 349.

The allegations at issue in this case are that because Applus was rebuffed in its effort to acquire QPro, it "purposed" to put it out of business, and its subsidiary, RTD, worked to that end by colluding with a third party to misrepresent QPro's ability to service its contract with Dow and to shift that contract work to the third party. Only RTD is a party to this case. QPro did not sue Applus. There is no allegation that Applus is liable because it engaged in tortious interference with its subsidiary, RTD. There is no allegation that Applus committed any misconduct at all. The only allegations are that Applus wanted to see QPro put out of business; that Applus failed to enter into a second lease agreement; and that Applus did not give any indication that it would withhold the

16

INCOTEST technology or refuse to renew the lease agreement when it expired.

In *Brown v. Pacific Life Insurance Co.*, the Fifth Circuit held that the second *Grigson* test is satisfied when the claims against the nonsignatory depend "in some part" on the tortious conduct of the signatory. 462 F.3d 384, 398–99 (5th Cir. 2006) (compelling a plaintiff to arbitrate claims against a parent company who was not a party to the arbitration agreement because the claims were factually tied to claims alleged against subsidiaries who were parties to the arbitration agreement). In *Palmer Ventures LLC v. Deutsche Bank AG*, the Fifth Circuit affirmed the district court's refusal to apply equitable estoppel to allow a taxpayer, who had signed an arbitration agreement with one defendant, to compel another defendant, an indirect subsidiary of the first, to arbitrate. 254 F. App'x 426, 431–32 (5th Cir. Nov. 19, 2007). The case arose out of a failed tax shelter. The plaintiff taxpayer alleged that the bank, tax advisor, and law firm had fraudulently induced him into participating in the tax strategy, and asserted claims for breach of fiduciary duty, fraud, and conspiracy. The specific allegation of the signatory's involvement in the strategy was that it held the plaintiffs' investment account. *Id.* at 427–28. The court noted that there were no specific allegations that the signatory had any role in the strategy other than to be the home for the investment account. In concluding that this was insufficient to satisfy the second prong of *Grigson*, the court emphasized that the "[k]ey to the decision in *Brown* was the fact that none of the claims against the non-signatories could be considered without analyzing the 'tortious acts' of the signatories.'" *Id.* at 432. The nonsignatory in *Deutsche Bank* did not explain how the taxpayer's claims against it required the court to consider any "tortious acts" committed by the signatory. The court noted that "[a]lthough Deutsche Bank may be understandably reluctant to identify any tortious actions or misconduct by DBSI (its indirect subsidiary), Deutsche Bank must do more than simply

17

conclude that DBSI is intertwined with the facts of this case." *Id.*; *see also Realty Trust Group, Inc. v. Ace American Ins. Co.*, Civ. No. 1:07CV73, 2007 WL 4365352, at *4 (S.D. Miss. Dec. 11, 2007) (finding that in the absence of any claim of conspiracy as between the signatory and nonsignatory, and any explanation of how the plaintiff's claims against the nonsignatory would necessarily require the court to consider any tortious acts committed by the signatory, there was no basis to compel arbitration under the second *Grigson* test). *Compare Ford Motor Co. v. Abies*, 207 F. App'x. 443, 448 (5th Cir. November 29, 2006) (compelling arbitration when the state court plaintiffs' allegations against nonsignatory Ford and signatory GCFM included that the state-court defendants "intentionally, willfully, maliciously and tortiously conspired between themselves and with others to unlawfully injure Plaintiffs" and that their "scheme was calculated to and in fact did cause Plaintiffs to purchase vehicles from [GCFM] based on false and fraudulent representations").

One court addressing a similar scenario has concluded that when a plaintiff sues a party not bound by the arbitration clause, and brings no claims against a signatory to that clause, the second prong of *Grigson* does not apply. In *Celanese Corp. v. Boc Group PLC*, the court held that the "second basis for compelling arbitration discussed in *Grigson* is only met if a signatory to the arbitration clause alleges interdependent conduct by both a signatory and a nonsignatory to the arbitration agreement and the nonsignatory defendant seeks to compel the signatory plaintiff to arbitrate all claims. Civ. A. No. 3:06-CV-1462, 2006 WL 3513633, at *6–7 (N.D. Tex. Dec. 6, 2006). That court declined to compel arbitration because the plaintiff had not alleged claims against the signatory but only against the nonsignatory affiliated company. *Id.*

In the present case, QPro did not sue Applus. QPro did not allege misconduct by Applus. QPro alleged that Applus had a connection with the facts of this case, but that is insufficient. As

stated in *Grigson,* the standard is "substantially concerted and interdependent *misconduct* . . . ." 210 F.3d at 527. A court can consider what RTD did without considering what Applus did. The second prong of *Grigson* is not met.[4]

## III. The Motion to Remand

QPro asks this court to remand if there is no basis to compel arbitration. The plaintiffs respond that this court has subject-matter jurisdiction over the action removed under § 205 even if the parties are not compelled to arbitrate.

RTD removed on the basis of 9 U.S.C. § 205, which states: "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the [Convention on the Recognition and Enforcement of Foreign Arbitral Awards], the defendant or the defendants may, at any time before the trial thereof, remove such action . . . ." The parties rely on *Beiser v. Weyler* in support of their arguments, which states in relevant part:

> Under § 205 . . . the federal issue in cases will often be resolved early enough to permit remand to the state court for a decision on the merits. The arbitrability of a dispute will ordinarily be the first issue the district court decides after removal under § 205. If the district court decides that the arbitration clause does not provide a defense, and no other grounds for federal jurisdiction exist, the court must ordinarily remand the case back to state court. *See* 28 U.S.C. § 1441(c) (granting district court discretion to remand all claims in which state law predominates); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) (noting that when all federal claims are resolved early in a lawsuit and only state law claims remain, the district court almost always should remand to the state court); *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989) (same). Except for state law claims that turn out to be subject to arbitration, § 205 will rarely permanently deprive a state court of the power to decide claims properly brought before it. The district court

---

[4] Because the requirements for compelling QPro to arbitrate its claims against RTD are not met, there is no need to address the argument that the claims are outside the scope of the arbitration clause.

> will ordinarily remand those cases that turn out not to be subject to arbitration, such that the state court will be able to resolve the merits of the dispute.

284 F.3d 665, 674–75 (5th Cir. 2002).

Under *Beiser*, this case should now be remanded. QPro's claim is based on state law and this court has found that the claim is not arbitrable. Absent § 205, no other basis for federal jurisdiction exists. *Beiser* holds that although removal of state law claims may be initially proper under § 205 as claims that "relate to" an arbitration agreement, once they are determined not to be arbitrable, remand to state court is appropriate. 284 F.3d at 674; *see also Certain Underwriters at Lloyd's v. Warrantech Corp.*, 4:04-CV-208-A, 2004 U.S. Dist. LEXIS 29953, at *8 (N.D. Tex. Sept. 23, 2004) ("Consistent with the expectations of the Fifth Circuit, now that the arbitration award issues have been removed from this case by a summary ruling, and there being 'no other grounds for federal jurisdiction' in this case, the case should be remanded to the state court."). Once the basis for federal question jurisdiction ceases to exist, or as in the instant case, when arbitrability is the basis for jurisdiction and can no longer be asserted as a defense, the case should be remanded for resolution of the state law claims.

**IV.   Conclusion**

RTD's motion to compel arbitration, (Docket Entry No. 12), is denied. QPro's motion to remand, (Docket Entry No. 13), is granted.

SIGNED on January 4, 2011, at Houston, Texas.

                                          Lee H. Rosenthal
                                  United States District Judge